1

2

3

4                            **UNITED STATES DISTRICT COURT**

5                                  **DISTRICT OF NEVADA**

6

7    LORI A. COLWELL,                         )
                                              )
8                     Plaintiff,              )   Case No.  2:15-cv-00782-JCM-GWF
                                              )
9    vs.                                      )   **FINDINGS AND**
                                              )   **RECOMMENDATION**
10   CAROLYN W. COLVIN, Acting Commissioner,  )
     Social Security Administration,          )
11                                            )
                      Defendant.              )
12   _____)

13           This matter is before the Court on Plaintiff Lori A. Colwell's Complaint (#1), filed on April

14   27, 2015.  The Acting Commissioner filed her Answer (#11) on September 11, 2015.  Plaintiff filed

15   her Motion for Judgment on the Pleadings (#20) on November 30, 2015.  The Acting Commissioner

16   filed her Opposition to Plaintiff's Motion for Reversal and Cross-Motion to Affirm (#21) on

17   December 17, 2015.   Plaintiff did not file a reply brief.

18                                          **BACKGROUND**

19           **A.      Procedural History.**

20           Plaintiff filed an application for Supplemental Security Income benefits on December 14,

21   2009.[1]  *See* Administrative Record ("AR") 164-167.  That application was denied on August 30,

22   2010.  AR 91-195.  Plaintiff filed a second application for Supplemental Security Income benefits on

23   October 17, 2011.  AR 168-173.  The Commissioner denied Plaintiff's application on January 17,

24   2012.  AR 96-100.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR

25   101.  The hearing was conducted on August 7, 2013 at which Plaintiff and a vocational expert

26

27   _____

28          [1]Supplemental security income is a Federal income supplement program funded by general tax revenues
     designed to help aged, blind and disabled people, who have little or no income; and to provide cash to meet basic
     needs for food, clothing and shelter.  *See Official Social Security Website, Supplemental Security Income Home
     Page – 2016 Edition, https://www.ssa.gov/ssi (Accessed April 7, 2016).*

appeared and testified.  AR 39-75.  The ALJ issued his decision on September 6, 2013 and

concluded that Plaintiff was not disabled from October 13, 2011 through the date of the decision.

AR 22-34.  Plaintiff's request for review by the Appeals Council was denied on February 24, 2015.

AR 1-6.  Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

This matter has been referred to the undersigned magistrate judge for a report of findings and

recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

**B.    Factual Background.**

**1.    Plaintiff's Disability/Work History Reports and Hearing Testimony**

Plaintiff Lori Ann Colwell was born on January 3, 1966 and was 47 years old at the time of

the August 7, 2013 hearing.  She is 5 feet, 7 inches tall and weighed 191 pounds at the time of the

hearing.  AR 78, 73.  Ms. Colwell attended school through the eleventh grade.  She did not have any

vocational training and did not obtain a general equivalency diploma ("GED").  AR 44.  Ms. Colwell

worked as a cashier and stock clerk for CVS pharmacy from May 1996 to April 1997.  She then

worked as a cashier for the Navy Exchange Store from May 1997 to December 1997.  AR 195-197.

She has not worked since 1997.

Ms. Colwell completed a Social Security Administration Function Report - Adult on

November 17, 2011.  AR 22-231.  She reported that she shattered the "ACL" on her left knee and

that she had a hard time walking without falling.  She also had a bad back which made it hard to

move.  She suffered from severe panic attacks and anxiety.  She had fibromyalgia that shot pain

throughout her entire body.  She cried all the time and had migraine headaches.  Plaintiff stated that

she awoke about every two hours and could not get back to sleep if she turned the wrong way.  She

sometimes needed help putting on shirts and shoes.  She had fallen in the shower and needed help

getting up off the toilet at times.  AR 222-223.  Ms. Colwell was able to make sandwiches, cook

frozen dinners and microwavable foods.  She was able to do laundry and keep her room clean on a

weekly basis.  She needed motivation from others to do these chores, but "freak[s] out if you push

me to far."  AR 224.  She went out if she had a doctor's appointment.  Because she fell a lot,

someone had to go with her when she had to walk.  She had never driven an automobile because she

had severe panic attacks when she tried to learn how to drive.  She shopped in stores for food and

1   clothes on a monthly basis for as long as necessary, but usually for about an hour and a half.  She

2   could pay bills, count change, handle a savings account and use a checkbook or money orders.  AR

3   225.  Plaintiff listed her hobbies and interests as reading and watching television, but stated she

4   could not concentrate as much as she did in the past.  For social activities she talked to her daughter

5   or used the computer.  She did not go out for social purposes.  She needed to be reminded when she

6   had doctor appointments.  AR 226.  She reported difficulty getting along with family members

7   because "they don't understand why I cry and get easily upset."  AR 226.

8       Ms. Colwell stated that her illness affected her ability to lift, squat, bend, stand, reach, walk,

9   sit, and kneel.  It affected her memory, ability to complete tasks, concentrate, and get along with

10  others.  It also affected her ability to use her hands.  She could only lift about five pounds.  She could

11  not squat or bend without her back going out.  She could only walk two to three blocks before

12  needing to stop and rest for five to ten minutes before resuming her walk.  She could pay attention

13  for one hour and did not finish what she started.  Her ability to follow written instructions varied.

14  She was able to follow spoken instructions.  AR 227.  She was able to get along with authority

15  figures.  She did not handle stress or changes in routine well.  She had a fear of falling down, of

16  dying and of not being able to get around.  She had used a cane and leg brace since 2008.  AR 227.

17      Plaintiff's fiancé Reinhard Naussner submitted a third party function report in support of

18  Plaintiff's application.  AR 214-221.  In response to the question how Plaintiff's illness, injuries or

19  conditions affected her ability to work, Mr. Naussner stated: "Lori's left knee has been operated on 3

20  times because of shattered ACL.  Constant panic attacks and has chronic migraines.  She has

21  fibromyalgia and cryes (sic) a lot from pain."  AR 214.  He noted that Plaintiff had a hard time

22  sleeping.  His description of her physical limitations was consistent with Plaintiff's report.  Mr.

23  Naussner also noted that Plaintiff's family and friends did not "understand mood swings that arise

24  from being in constant pain or depressed or anxious."  AR 219.

25      Ms. Colwell testified at the August 7, 2013 hearing that she stopped working because she

26  contracted Lyme disease and got very ill.  AR 45.  She acted as "sort of a housewife" and mother

27  after she stopped working.  In 2001, she tore the anterior cruciate ligament in her left knee, and was

28  not able to fully function as a housewife thereafter.  Her children and parents helped her maintain the

3

household.  AR 53.  She testified that she was unable to work because she had a very hard time standing for more than a half hour due to her knee condition.  She could not sit for longer than an hour before having to lay down due to spasms in her hip and leg.  AR 45-46, 51.  She used a cane when she went out walking or if she went to the store and was likely to be on her feet for more than an hour.  She did not have her cane with her at the hearing.  AR 46.  She could walk for about twenty minutes straight, but then needed to rest because of her left knee and back pain.  AR 51.  She wore a brace on her left knee that was prescribed by her physician.  She also wore a lighter, non-prescribed brace on her right knee for support.

Ms. Colwell testified that she spent most of the day watching television or reading.  She did not drive an automobile because she had anxiety and panic disorder and did not believe it was safe to drive.  AR 47-48.  She went to the store approximately twice a month for an hour on each occasion.  She would sometimes sit on the benches at the store.  AR 49.  During the day, she did "little things" around the house such as make her bed and dust her dresser.  She did not cook herself, but assisted her mother-in-law by chopping food, hand mixing, or putting dishes out for dinner.  She did not pick up the dishes after dinner because she had difficulty bending.  She folded laundry, but did not load or remove laundry from the washer and dryer because this would cause her back to give out or her knee to buckle.  She did not vacuum, sweep or mop floors.  Ms. Colwell testified that she sat down in the shower and needed help tying her shoes.  She had a hand bar in the bathroom that assisted her in getting up and down from the toilet.  AR 49-51, 58.

Ms. Colwell testified that she lost her medical insurance coverage in November 2012 after she moved to Las Vegas from Philadelphia.  She moved to Las Vegas because her fiance's family moved there.  She applied for a medical card after moving to Nevada, but was still waiting to receive it at the time of the hearing.  AR 51-52.  Plaintiff stated that she went to the emergency room in November 2010 for pain in her left knee after she fell.  She would fall if she leaned on her left leg too much and it gave out.  She had fallen while wearing her knee brace and sometimes when using a cane.  AR 54.  She testified that Dr. Brian Brislin told her on July 7, 2011 that her left knee could not be repaired because she had "severe arthritis and many other problems with it."  He indicated that she needed knee replacement surgery.  She had severe knee pain and it felt like someone hit it with a

bat. AR 55. She was only taking over-the-counter pain medications because she no longer had insurance. She had previously taken MS Contin, Oxycodone, Endocet, Pherenol, Klonopin, and Gabapentin. AR 56. These medication were effective in reducing her pain, but they did not eliminate it. Even with these medications, she could not lean on her knee or "walk long." The medications made her very tired, and some made her nauseous or irritable. Some of the side effects subsided, but she was always tired. She also wasn't eating right. AR 56-57.

Ms. Colwell stated that Dr. Thomas Barone and Dr. Brislin sent her to physical therapy. She also received joint and trigger point injections every month or every other month for a two year period. AR. 57-58. The injections worked for a while, but then ceased being effective in relieving her pain. AR 58. Ms. Colwell stated that she wanted to try more injections once she obtained insurance again to see if she could get a little more support for her knee. AR 45-47.

The ALJ asked Plaintiff if she recalled one of her doctors stating that her complaints were out of proportion to what he was seeing from a clinical point of view. Ms. Colwell did not recall such a statement. The ALJ asked Plaintiff about the diagnosis of fibromyalgia and stated that he didn't see any evidence of trigger point testing "or anything to really show fibromyalgia." The ALJ, however, did not obtain a response from Plaintiff regarding the diagnosis of fibromyalgia. AR 59-60. Ms. Colwell testified that Dr. Brislin stated he would not perform knee replacement surgery because of her age. AR 47. The ALJ commented that the doctor's records indicated that Plaintiff's fibromyalgia and chronic use of narcotic pain medication would make any surgery potentially difficult. AR 60. He further stated: "Now, I know that the doctors frequently don't really like to do a total knee replacement for a younger person, as a general rule. . . . My thought has always been well, that may be true, and maybe that's good, generally speaking, but when you need it, you need it. Right?" Ms. Colwell responded: "I agree with you on that, yes. . . . [T]hat's why – my depression continued to be worse because they told me even though I need it, that because of my age – I'm not going to get it." AR 60. The ALJ responded that the inability to obtain surgery may have been more an insurance issue than anything else. AR 61.

Vocational expert Harlan Stock testified that Plaintiff's only past relevant work was as a cashier which was light work, or a little more than light work as performed by Plaintiff. AR 62. The

ALJ asked the vocational expert to assume a person of Plaintiff's age, education and experience who was deemed capable of working at the light exertional level, "with all posturals occasional," no climbing ropes, ladders or scaffolds, limited to standing or walking a total of four hours in an eight hour day, and who must avoid concentrated exposure to chemicals and pulmonary irritants such as fumes, odors, dust, gasses, poorly ventilated areas and smoke, chemicals, hazardous machinery, unprotected heights, and operational control of moving machinery. The ALJ further clarified that the person would be able to stand or walk for four hours in an eight hour workday. The ALJ asked whether a person with those limitations could perform Plaintiff's past work as a cashier. The vocational expert testified that the person would not be able to perform Plaintiff's past work. AR 62. The ALJ asked if there was other light or sedentary work available in sufficient numbers in the national economy that the person could perform. The vocational expert testified that the person could perform the light exertional level jobs of mail clerk, school bus monitor, and garment sorter. The person could perform the sedentary jobs of surveillance system monitor, addresser, and stuffer. AR 63-65.

Plaintiff's counsel asked the vocational expert whether the hypothetical person would be able to perform Plaintiff's past work or the other work identified by the vocational expert if the person was "off task" 15 percent of the time over and above normal work breaks. The vocational expert said no. AR 70. Plaintiff's counsel next asked whether the hypothetical person would be able to perform Plaintiff's past work or other work identified by the vocational expert if the person was limited to lifting and carrying 10 pounds occasionally, was limited to standing and walking a total of one hour in an eight hour workday, and sitting less than six hours in an eight hour workday. The vocational expert also answered no. AR 70-72.

### 2.    Medical Records.

Dr. Thomas C. Barone, an osteopathic physician who practices pain management, wrote three letters regarding Ms. Colwell's medical condition. In his first letter dated January 27, 2010, Dr. Barone stated that Plaintiff had been under his care since December 1, 2004 and had been treated approximately once per month. He diagnosed Plaintiff as suffering from chronic low back pain, cervicalgia (neck pain), fibromyalgia, degenerative joint disease of the left knee, internal

1   derangement of the left knee, tension headaches, generalized anxiety disorder, and panic disorder.

2   Dr. Barone stated that Plaintiff required ongoing care including prescription medication.  He

3   provided a list of her medications at that time.  AR 350.  On June 18, 2010, Dr. Barone repeated the

4   statements in his January 27, 2010 letter.  AR 349.  In his March 9, 2012 letter, Dr. Barone also

5   repeated the statements in his previous letters regarding the time period that Plaintiff had been under

6   his care and his diagnoses of her condition.  He further stated:  "It is my professional opinion that

7   Ms. Lori Colwell is totally disabled from any gainful employment at this time."  AR 348.

8       The record contains patient progress notes and patient telephone records from Dr. Barone

9   from December 1, 2004 through December 14, 2011.  These notes indicate that beginning in

10  December 2004, Plaintiff consistently complained of headaches, neck pain, and back pain.  On

11  March 23, 2005, Dr. Barone included fibromyalgia as a diagnosis, together with chronic neck and

12  back pain, and headaches.  AR 386.  On April 21, 2005, he noted that Plaintiff's neck and back pain

13  and headaches were worse since a motor vehicle accident on November 3, 2004.  AR 387.  Plaintiff

14  also complained of situational anxiety and stress.  AR 387-389.  Fibromyalgia dropped off as a listed

15  diagnosis in the notes from July 19, 2005 through August 11, 2005.  The notes from August 29, 2005

16  to August 1, 2006  appear to consist of telephone prescription refills, but no in-office medical visits

17  or examinations.  AR 391-394.  It appears that Plaintiff was seen in Dr. Barone's office on August

18  11, October 4, November 30, and December 29, 2006.  AR 394-397.

19      Beginning in or about January 2007, Dr. Barone administered trigger point injections to

20  Plaintiff on approximately a monthly basis.  AR 397-400.  A September 10, 2007 note stated that

21  Plaintiff had severe left knee pain and an x-ray showed degeneration.  Dr. Barone advised Plaintiff to

22  see an orthopedic physician.  He also advised her to obtain a neurological evaluation for her radiating

23  neck and back pain.  AR 401.  On January 2, 2008, Dr. Barone noted that Plaintiff was hospitalized

24  from December 27 to 30, 2007 for intractable pain.  AR 403.  On April 22, 2008, Dr. Barone noted

25  that Plaintiff had multiple tender points in the trapezius, paraspinal and hip areas and that she

26  complained of persistent neck and back pain, myalgias and left knee pain.  AR 405.  On June 17,

27  2008, he noted additional complaints of migraine headaches.  AR 406.  On December 2, 2008, Dr.

28  Barone noted that Plaintiff was commencing physical therapy for pre-operative strengthening of her

1  left knee.  AR 409.  Dr. Barone saw Plaintiff on March 21, 2009 and again included fibromyalgia as

2  one of the listed diagnoses.  AR 353.  Plaintiff continued to consistently complain of left knee pain,

3  back pain, headaches and other symptoms through the end of 2011.  She also complained of right

4  knee pain at times.  Dr. Barone also noted tender trigger points throughout his notes from March 23,

5  2009 to December 2011.  AR 353-382.

6      Ms. Colwell was seen by Dr. Brian Brislin, an orthopedic surgeon, on January 8, 2009 for

7  follow-up evaluation regarding her left knee.  Plaintiff reported that she was still having a lot of pain

8  in the left knee.  Her brace was helping a little bit.  She reported a resurgence of sciatica.  She also

9  reported abdominal pain associated with gall bladder disease/gallstones, and pain in the groin and

10  upper thigh.  Plaintiff was not sure if the upper leg pain radiated down from the buttocks or up from

11  the knee.  She was receiving physical therapy which was helping somewhat.  On physical

12  examination, Dr. Brislin noted that the knee demonstrated 5-10 degrees flexion contracture to 100

13  degrees of flexion.  The knee brace was well fitting.  He noted gross instability on the knee.  AR 325.

14  Dr. Brislin further stated:

15      I have discussed with her that my primary concern remains the fact that
        the pain is out of proportion to her examination and to her clinical and
16      radiographic findings.  I have recommended several things before
        proceeding with any type of surgery.  We are going to have her see Dr.
17      Galapo for pain management to see about the possibility of pain
        control.  We are going to have her see Dr. Medway for an EMG to
18      evaluate for the possibility of superimposed radiculopathy.  We are
        also going to have her get a bone scan to evaluate for any type of
19      osteopenia or other RSD picture.  She does not have any trophic
        changes about the knee.  The knee can be palpated, it is not hyper
20      sensitive.  Certainly any type of provocative maneuver such as
        Lachman's will cause her increasing pain, but again, no significant
21      burning type pain, no pain with rubbing the knee with alcohol.

22      AR 325.

23      Dr. Brislin next saw Ms. Colwell on February 10, 2009 at which time she had not obtained

24  the EMG or bone scan.  Dr. Brislin observed the possible odor of alcohol on Plaintiff.  Upon direct

25  questioning, however, Plaintiff stated that she did not drink.  Dr. Brislin reiterated to Plaintiff the

26  need to obtain the EMG and bone scan studies.  AR 325.  It appeared that Dr. Brislin's office

27  attempted to contact Plaintiff on April 10, 2009, but did not make contact with her.  AR 324.

28  . . .

8

1       Plaintiff was seen at Penn Medicine, an outpatient medical care facility, on February 18,

2   2010.  AR 266-267.  She reported chronic pain in her back and knees which started in 1999 with a

3   diagnosis of Lyme's disease.  Examination findings indicated decreased range of motion in the

4   lumbar spine and left knee.  Plaintiff was prescribed medication for her pain and also Celexa for

5   depression and was given a referral to Dr. Barone for pain management.  AR 267.  Plaintiff was seen

6   again on March 16, 2010 at which time she reported that she stopped taking the Celexa after three

7   days, apparently because of side effects.  AR 278-279.  She was given a prescription for Effexor.  On

8   May 17, 2010, Plaintiff reported that she stopped taking the Effexor after two weeks due to increased

9   anxiety.  She had a mental evaluation scheduled at the Tree of Life on June 8, 2010.  The doctor

10  noted that Plaintiff ran out of her Percocet pain medication and that she had an appointment with Dr.

11  Barone scheduled for May 22, 2010.  AR 276.  Plaintiff was scheduled for a follow-up appointment

12  at Penn Medicine on July 27, 2010, but was a no show.  AR 274.

13      A state agency physician prepared a "Psychiatric Review Technique" form on August 19,

14  2010.  AR 281-294.  The physician noted that Plaintiff failed to keep a consulting examination

15  appointment and that there was only one mental examination report dated February 10, 2010.  The

16  physician therefore concluded that there was insufficient evidence to determine the severity of

17  Plaintiff's mental impairment.  ARE 294.

18      Plaintiff was seen at Aria Health Emergency Department in Philadelphia on November 9,

19  2010 for complaints of knee pain.  It was noted that she had prescriptions for Percocet and

20  Oxycodone.  She was instructed to use the pain medication she had at home for her knee pain.  AR

21  302-303.

22      Ms. Colwell was seen by Dr. Oana Vlad, a primary care physician, on June 29, 2011.  AR

23  311.  Dr. Vlad noted that Plaintiff was still seeing Dr. Barone for her chronic pain.  Under review of

24  symptoms, Plaintiff reported heartburn and nausea, back pain and joint pain, tremors and headaches.

25  Plaintiff also stated she bruised and bled easily, and she suffered from depression,

26  nervousness/anxiety and insomnia.  AR 311.  On physical examination, Dr. Vlad noted normal range

27  of motion in the neck and musculoskeletal system.  Plaintiff had no edema or tenderness.  The

28  neurological examination was normal and Plaintiff's mood, memory, affect and judgment appeared

1    normal.  AR 312.  Dr. Vlad subsequently saw Plaintiff on July 25, 2011.  She noted Plaintiff's past

2    medical history of chronic low back pain, degenerative joint disease of the knee, degenerative disc

3    disease of the lumbar spine, fibromyalgia, Lyme disease, hypertension, anxiety state unspecified, and

4    migraine headaches—all with a reported diagnosis date of October 19, 2010.  She further noted that

5    Plaintiff was diagnosed with gastroesophageal reflux disease as of June 29, 2011.  AR 315.  Plaintiff

6    reported back pain and headaches.  On physical examination, she had normal range of motion in the

7    neck and musculoskeletal system, but exhibited tenderness. The neurological examination findings

8    were normal and her mood, memory, affect and judgment appeared normal.  AR 316.

9         Dr. Brislin saw Ms. Colwell on July 7, 2011 at the request of Dr. Vlad.  This was more than

10   two years after his last previous visit with her.  Plaintiff reported that she was still experiencing left

11   knee pain.  She stated that she fell four to six times a week due to her leg giving out.  Her leg could

12   remain swollen for several hours to several days after a fall.  She reported a recent increase in her

13   sciatica which appeared to affect both legs.  She also noticed increasing vertigo and stated that she

14   walked into walls.  Plaintiff had fibromyalgia pain symptoms in the back, shoulders and both arms.

15   At times it was so bad that she could not write.  Dr. Brislin noted that Plaintiff was currently in pain

16   management with another physician.  On physical examination, Plaintiff had full range of motion in

17   both knees, but her left knee range of motion was painful.  She could fully extend her left knee.

18   Flexion caused increasing pain at 120 degrees.  Dr. Brislin noted a significant amount of guarding.

19   There were multiples sores throughout Plaintiff's upper and lower extremities which she stated was a

20   reaction to her menstrual cycle.  Dr. Brislin discussed several issues with Ms. Colwell.  She had

21   patellofemoral arthritis and lateral femorotibial compartment arthritis which Dr. Brislin believed

22   were related to her ACL tear.  The instability of her knee was due to a combination of arthritis and

23   the loss of ligamentous support.  Dr. Brislin again stated that Plaintiff's knee pain seemed to be out

24   of proportion to what was noted on the clinical exam as well as what he saw on the x-ray.  He had

25   previously recommended that Plaintiff have an EMG as a workup for any type of complex regional

26   pain syndrome.  He stated that fibromyalgia and chronic narcotic use would make any surgery

27   potentially difficult.  Dr. Brislin therefore recommended a new MRI of the left knee and an EMG of

28   the bilateral lower extremities, and scheduled Plaintiff for follow-up after the MRI and EMG studies.

10

1    AR 323.

2         Dr. Brislin next saw Ms. Colwell on August 4, 2011.  He noted that she obtained the MRI on

3    July 11, 2011.  The EMG that was scheduled prior to this appointment was cancelled due to Plaintiff

4    becoming ill and having a high fever, but was rescheduled for the following week.  Dr. Brislin noted

5    that, subjectively, Plaintiff still had severe pain in the left leg and that she had constant pain and

6    difficulty with moving the leg.  On physical examination, Plaintiff had reasonably well preserved

7    range of motion of the left knee.  She had palpable tenderness of the left knee.  Pain was noted over

8    the medial and lateral sides and there was valgus malalignment of the left knee.  The x-rays and MRI

9    showed the valgus malalignment, and the MRI demonstrated osteoarthritic changes of the lateral

10   femoral condyle and lateral tibial plateau.  The ACL graft was vertical on the MRI and appeared to

11   be ruptured.  Dr. Brislin stated the plan was to treat Plaintiff for osteoarthritis of the left knee.  He

12   did not believe further reconstruction of the ligament would be beneficial.  He recommended

13   exercises for the Plaintiff and gave her a handout regarding viscosupplementation techniques

14   including Orthovisc.  Plaintiff was to see Dr. Brislin in three months for follow-up.  She was to also

15   obtain the EMG and the doctor would contact her if it was abnormal.  AR 322.

16        An MRI of Plaintiff's lumbar spine was obtained on November 21, 2011.  It showed mild

17   degenerative disc disease at L4-5 and L5-S1 with slight disc bulge at both levels.  AR 332.  An

18   earlier MRI performed in December 2003 showed very slight disk dessication at L5-S1, but was

19   otherwise normal.  AR 333-334.

20        Dr. John DeCarlo performed a disability examination of Ms. Colwell on January 3, 2012 at

21   the request of the Bureau of Disability Determination.  AR 335-342.  Dr. DeCarlo noted that Plaintiff

22   was 5 feet 8 inches tall and weighed 200 pounds.  Plaintiff described her mental state as depressed

23   and she described her memory and concentration as forgetful.  On examination of Plaintiff's

24   extremities, there was no palpable edema.  The pulses were +1/2 bilaterally.  Trendelenburg's,

25   Perthes', and Homans' tests were negative.  There was pain on straight leg raising—5 degrees on the

26   left side and 10 degrees on the right side.  There was no atrophy above or below either knee joint.

27   Deep tendon reflexes were equal in the upper and lower extremities bilaterally.  Motor power was

28   5/5 in the upper and lower extremities bilaterally.  Sensation was within normal limits.  Dr. DeCarlo

indicated that Plaintiff had "post ACL repair on the left knee, fibromyalgia, anxiety with panic attacks, bulging disks of the lumbar spine, hypertension, hyperlipidemia, and gastroesophageal reflux disease." AR 337.

Dr. DeCarlo completed a "Medical Source Statement of Claimant's Ability to Perform Work Related Activities" form. AR 339-340. He stated that Ms. Colwell could occasionally lift and carry up to ten pounds. Her ability to lift and carry was limited due to back pain. She could stand and walk one hour or less (cumulative in 8-hour day) due to back pain and left leg pain. She could sit for only one hour due to back pain. Her ability to push and pull was limited in the upper and lower extremities due to left sided pain. Plaintiff could occasionally bend, kneel, stoop, crouch, balance and climb. There was no limitation on her ability to reach, handle, finger, feel, see, hear, speak, taste, smell, or with respect to continence. Dr. DeCarlo found no environmental limitations.

State agency physician Dr. Catherine Smith reviewed the medical records in this case and provided a residual functional capacity assessment on January 13, 2012. In contrast to Dr. DeCarlo, Dr. Smith stated that Plaintiff had the ability to lift and carry 20 pounds occasionally and 10 pounds frequently. Plaintiff could stand and/or walk about six hours in an eight hour workday, and could sit for about six hours in an eight hour workday. She could occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. She could occasionally balance, stoop, crouch, and crawl, but never kneel. Dr. Smith stated that Plaintiff should avoid concentrated exposure to extreme cold or heat, wetness, and humidity, and fumes odors, dusts, gasses and poor ventilation, and to hazardous machinery. AR 78-86.

On September 15, 2012, Dr. Barone completed a "Multiple Impairment Questionnaire" regarding Plaintiff's condition. He stated that his most recent examination of Plaintiff was on August 24, 2012, and that he treated her every four weeks. Dr. Barone diagnosed her condition as chronic low back pain, herniated lumbar discs (L4-5, L5-S1), chronic lumbar sprain/strain, degenerative disc disease, fibromyalgia, internal derangement and osteoarthritis of the left knee, anxiety, depression, and chronic headaches. He stated that the prognosis for recovery was poor and that her prognosis was "Guarded: fair to good for control of symptoms to tolerable level." AR 412. In support of his diagnoses, Dr. Barone cited the following clinical findings: "antalgic gait,

1  hypertonic muscles, paraspinal decrease T-L ROM, multiple diffuse tenderpoints, [+] crepitus and

2  inflammation - synoviti [left] knee, [+] valgus deformity [left] knee." AR 412. He referenced the

3  MRI reports of the lumbar spine and left knee as diagnostic test results that supported his diagnoses.

4  He stated that Plaintiff's primary symptoms were severe pain, stiffness, headache, light sensitivity,

5  fatigue, irritability, anxiety, nervousness, and depressed mood. He stated that these symptoms were

6  reasonably consistent with Plaintiff's physical and emotional impairments.

7       Dr. Barone indicated that Plaintiff's pain was achy, throbbing and sharp at times. The pain

8  was located in the low back, knees, neck, shoulders, head and hip. AR 413. Plaintiff's pain was

9  constant. Precipitating factors leading to Plaintiff's pain included her history of Lyme disease, a

10  motor vehicle accident in November 2004, anxiety and depression, and multiple falls/injury affecting

11  her left lower extremity/knee and lumbar spine in August 2005, November 2010, and May 2011. Dr.

12  Barone rated Plaintiff's level of pain as 7 to 10 on a scale of 1 to 10. Her fatigue level was an 8. Dr.

13  Barone stated that he had been unable to relieve her pain without unacceptable side effects. AR 414.

14      Dr. Barone stated that in an eight-hour day Plaintiff could only sit for one hour, and could

15  only stand/walk from zero to one hour. Plaintiff could not sit continuously in a work setting and she

16  needed to be able to get up and move around for fifteen minutes every one to two hours. AR 414-

17  415. Plaintiff could lift and carry 0-5 pounds frequently and could lift 10-20 pounds occasionally.

18  She had significant limitations in doing repetitive reaching, handling, fingering and lifting because of

19  hand tremors. In an eight hour workday, she would be moderately limited in using her upper

20  extremities, using her fingers and hands for fine manipulation, and using her arms for reaching. AR

21  415-416.

22      Dr. Barone stated that Plaintiff was prescribed MS Contin, Oxycodone, Endocet, Fiorinol,

23  and Klonopin and that she had no significant side effects from the medications. She had also

24  received physical therapy, joint and trigger point injections, and osteopathic manipulative treatment.

25  Dr. Barone opined that Plaintiff's symptoms were likely to increase in a competitive work

26  environment, and that she would have difficulty looking at a computer screen or looking down while

27  seated at a desk. AR 416. She could not perform work that required activity on a sustained basis.

28  Her pain, fatigue or other symptoms would constantly interfere with her ability to concentrate and

pay attention.  Dr. Barone stated that Plaintiff could not tolerate even low work stress because of her chronic persistent symptoms.  She would need to take unscheduled breaks every 30-60 minutes that would last 15-20 minutes.  AR 417.  She was likely to be absent from work more than three times a month.  Plaintiff was also prone to infections because of skin cellulitis associated with wearing a knee brace for an extended period and also because of anxiety associated with being a skin picker and cigarette smoker.  Dr. Barone identified the following additional limitations that would affect Plaintiff's ability to work: psychological limitations; need to avoid noise, fumes, gases, temperature extremes, and heights; and limitations on pushing, pulling, kneeling, bending and stooping.  AR 418.

### C.    Administrative Law Judge's September 6, 2013 Decision.

The ALJ applied the five-step sequential evaluation process established by the Social Security Administration in determining whether Plaintiff was disabled.  AR 22-34.  The ALJ stated that Plaintiff had not engaged in substantial gainful activity since the date of her application, October 13, 2011.  AR 24.  At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine and herniated lumbar disc; degenerative joint disease and internal derangement of the left knee status post ACL repair: and fibromyalgia.  (20 CFR 416.920(c)).  AR 24.  The ALJ found that Plaintiff's dyslipidemia, folliculitis, perifolliculitis, migraine headache, hypertension, gastroesophageal reflux disease, and tension headaches did not cause more than minimal functional limitations and therefore were not severe impairments, individually or in combination, for Social Security purposes.  He also found that Plaintiff's medically determinable impairments of depression and anxiety did not cause more than minimal limitation on her ability to perform basic mental work activities and were "non-severe" for Social Security purposes.  AR 25.  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).  AR 26.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), subject to the following limitations: Plaintiff was limited to standing and walking four hours in an eight hour workday.  She could not climb ladders, ropes or scaffolds, but she could perform all other postural activities occasionally.  Plaintiff had to

1    avoid concentrated exposure to chemicals and pulmonary irritants such as smoke, fumes, odors,

2    gases, and poorly ventilated areas.  She also had to avoid concentrated exposure to hazardous

3    machinery, unprotected heights, and operational control of moving machinery.  AR 26.  After

4    summarizing Plaintiff's statements and testimony regarding her symptoms and limitations, the ALJ

5    stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause

6    some of the alleged symptoms; however, the claimant's statements concerning the intensity,

7    persistence and limiting effects of these symptoms are not entirely credible for the reasons explained

8    in this decision."  AR 27.

9          The ALJ noted, with respect to Plaintiff's left knee pain, that Dr. Brislin was concerned that

10   her pain seemed out of proportion to the clinical examination findings and the x-ray.  After

11   summarizing Dr. Brislin's observations and treatment plan, the ALJ stated that "[t]here is no

12   evidence that the claimant ever received the EMG testing as repeatedly requested by Dr. Brislin.

13   This would suggest that claimant did not find her symptoms bothersome enough to warrant medical

14   compliance with Dr. Brislin's recommended EMG testing."  AR 28.

15         In regard to Plaintiff's back pain, the ALJ stated that Dr. Barone's records showed that she

16   was diagnosed with degenerative disc disease.  However, Dr. Barone provided only conservative

17   treatment which consisted of some trigger point injections.  The ALJ stated that the record did not

18   show that she underwent surgery or physical therapy sessions "which doctors usually prescribe when

19   conservative treatment fails.  A reasonable inference, therefore, is that her symptoms were not as

20   severe as alleged, which detracts from her general credibility."  The ALJ also stated that Dr.

21   Barone's March 9, 2012 opinion that Plaintiff was totally disabled from any gainful employment was

22   not binding on the Commissioner or an adjudicator.  AR 28.

23         The ALJ noted that Plaintiff stated in her disability report that she needed to start seeing a

24   mental health doctor due to her severe depression and anxiety, and that she claimed she had anxiety

25   attacks, cried all the time, and had worsening headaches.  The evidence showed, however, that

26   Plaintiff never received inpatient or outpatient mental health treatment.  "She reported that she had

27   relationship issues to Dr. Barone, a pain management doctor, who prescribed her psychotropic

28   medications.  This lack of treatment is wholly inconsistent with her allegations of disabling mental

1  symptoms." AR 28-29.

2       The ALJ gave little weight to the opinion of Dr. DeCarlo. He stated that Dr. DeCarlo's

3  determination that Plaintiff could stand and/or walk only one hour in a eight hour workday was

4  inconsistent with his finding that she had normal motor strength in the lower extremities. The ALJ

5  stated that "[o]ne would expect an individual with full strength in his lower extremities to have the

6  capability to stand for more than 1 hour in an 8-hour day." The ALJ also stated that "[o]ne would

7  believe that an individual who was only able to stand and walk 1 hour in an 8-hour workday would

8  be more limited in performing postural activities than Dr. DeCarlo has indicated. There was no

9  objective evidence elicited during Dr. DeCarlo's examination or in the medical evidence that would

10  support a finding that the claimant had such extreme limitations in standing and/or walking." The

11  ALJ was also confused by Dr. DeCarlo's statement that Plaintiff could sit for less than six hours in

12  an 8-hour workday and his note that Plaintiff could sit for one hour due to back pain. The ALJ was

13  inclined to believe that Dr. DeCarlo meant that Plaintiff could sit for one hour at a time, but was

14  unable to draw such a conclusion. AR 29.

15       The ALJ also gave little weight to Dr. Barone's September 15, 2012 responses to the

16  Multiple Impairment Questionnaire. The ALJ cited several reasons for rejecting his opinions. First,

17  Dr. Barone was a "family doctor and not an orthopedic doctor, psychologist, or psychiatrist" and his

18  opinion rested, at least in part, on areas outside his expertise. Second, Dr. Barone's report "failed to

19  reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant

20  were in fact disabled." Third, the course of treatment pursued by Dr. Barone had not been consistent

21  with what one would expect if the claimant were truly disabled. Fourth, Dr. Barone's opinion

22  contrasted sharply with and was not supported by other evidence in the record which rendered it less

23  persuasive. Finally, the ALJ stated:

24          The possibility always exists that a doctor may express an opinion in
   an effort to assist a patient with whom he or she sympathizes for one
25          reason or another. Another reality which should be mentioned is that
   patients can be quite insistent and demanding in seeking supportive
26          notes or reports from their physicians, who might provide such a note
   in order to satisfy their patient's requests and avoid unnecessary
27          doctor/patient tension. While it is difficult to confirm the presence of

  . . .
28    . . .

16

1
2

> such motives, they are more likely in situations where the opinion in
> question departs substantially from the rest of the evidence of record,
> as in the current case.

3    AR 30.

4    The ALJ chose to give great weight to the opinion of Dr. Catherine Smith, a state agency

5    medical consultant who reviewed the records and concluded that Plaintiff had the residual functional

6    capacity to perform work at the light exertional level, consistent with the determination made by the

7    ALJ.  AR 29, 78-86.

8    The ALJ stated that Plaintiff's statements regarding the severity of her symptoms were not

9    credible to the extent they were inconsistent with his determination of her RFC "because they were

10   not supported by the objective medical signs and findings of record as a whole under SSR 96-07p."

11   The ALJ stated that "[t]he consensus was that the claimant's medications and overall treatment had

12   controlled her symptoms and her protestations to the contrary, not objectively demonstrated, appear

13   to be exaggerations."  AR 30.  The ALJ stated Plaintiff's statements about her limited daily activities

14   could not be "objectively verified with any reasonable degree of certainty."  The ALJ also stated that

15   even if Plaintiff's symptoms were as limited as she alleged, it was "difficult to attribute that degree

16   of limitation to the claimant's medical condition, as opposed to other reasons, in view of the

17   relatively weak medical evidence and other factors discussed in this decision."  The ALJ therefore

18   gave little probative weight to her testimony.  He also stated that claimant's earning history showed

19   that she never worked at substantial gainful activity levels which raised some question as to whether

20   her current unemployment was truly the result of medical problems.  AR 31.

21   The ALJ also did not accord "significant weight" to the assertions of Plaintiff's fiancé, Mr.

22   Naussner, because, like Plaintiff's statements, his assertions were not consistent with the

23   preponderance of the opinions and observations of the medical doctors.  AR 31.

24   Based on his determination that Plaintiff had the residual functional capacity to perform light

25   work, the ALJ found at step four that Plaintiff could not perform her past work as a cashier which

26   was performed by her at the medium exertional level.  AR 32.  He found at step five, however, that

27   Plaintiff could perform other light or sedentary work available in the national economy, including

28   mail clerk, school bus monitor, garment sorter, surveillance system monitor, addresser and stuffer.

1   The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act

2   from October 13, 2011 to the date of his decision.  AR 33-34.

3                                              **DISCUSSION**

4        **I.    Standard of Review**

5        A federal court's review of an ALJ's decision is limited to determining only (1) whether the

6   ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper

7   legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924

8   F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a

9   mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might

10  accept as adequate to support a conclusion."  *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000)

11  (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d

12  503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both adverse and

13  supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings

14  of the Commissioner of Social Security are supported by substantial evidence, the District Court

15  must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to

16  more than one rational interpretation, the Court is required to uphold the decision.  *Moore v. Apfel*,

17  216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).

18  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court may not substitute its

19  judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the

20  ALJ's decision.  *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

21       It is incumbent on the ALJ to make specific findings so that the court need not speculate as to

22  the findings.  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981), citing *Baerga v. Richardson*,

23  500 F.2d 309 (3rd Cir. 1974).  In order to enable the court to properly determine whether the

24  Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as

25  comprehensive and analytical as feasible and, where appropriate, should include a statement of

26  subordinate factual foundations on which the ultimate factual conclusions are based."  *Lewin*, 654

27  F.2d at 635.

28  . . .

1      In reviewing the administrative decision, the District Court has the power to enter "a

2  judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

3  with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In the alternative, the

4  District Court "may at any time order additional evidence to be taken before the Commissioner of

5  Social Security, but only upon a showing that there is new evidence which is material and that there

6  is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  *Id.*

7      **II.    Disability Evaluation Process**

8      To qualify for disability benefits under the Social Security Act, a claimant must show that:

9  (a) he/she suffers from a medically determinable physical or mental impairment that can be expected

10  to result in death or that has lasted or can be expected to last for a continuous period of not less than

11  twelve months; and (b) the impairment renders the claimant incapable of performing the work that

12  the claimant previously performed and incapable of performing any other substantial gainful

13  employment that exists in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.

14  1999); *see also* 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving disability.

15  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  If the

16  claimant establishes an inability to perform his or her prior work, the burden shifts to the

17  Commissioner to show that the claimant can perform a significant number of other jobs that exist in

18  the national economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007).

19      Social Security disability claims are evaluated under a five-step sequential evaluation

20  procedure.  *See* 20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir.

21  2001).  The claimant carries the burden with respect to steps one through four.  *Tackett v. Apfel*, 180

22  F.3d 1094, 1098 (9th Cir. 1999).  If a claimant is found to be disabled, or not disabled, at any point

23  during the process, then no further assessment is necessary.  20 C.F.R. § 404.1520(a).  The five steps

24  of the evaluation process are outlined in the ALJ's decision and will not be repeated here.  AR 22-24.

25  The ALJ also analyzed Plaintiff's claim in accordance with the evaluation process and concluded at

26  step five that she was not disabled.  AR 24-34.

27  . . .

28  . . .

1

### III.    Whether the ALJ Erred at Step Five.

2        The ALJ's finding at step five of the sequential evaluation process that Plaintiff could

3    perform other light or sedentary jobs was based on the determination that she had the residual

4    physical functional capacity to perform light work.  That determination was based the ALJ's

5    rejection of the opinions of Plaintiff's treating physician, Dr. Barone, and the examining physician,

6    Dr. DeCarlo, that Plaintiff was not able to perform light or sedentary work.  The ALJ instead gave

7    great weight to the residual functional capacity assessment of Dr. Catherine Smith, a nonexamining

8    medical consultant.  The ALJ also rejected the credibility of Plaintiff's statements and testimony

9    regarding the severity of her pain and other impairments.

10        As stated in *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014), the court has developed

11    standards in conjunction with the relevant regulations that guide the analysis of an ALJ's weighing

12    of medical evidence.  Specifically, the court distinguishes among the opinions of treating physicians,

13    examining physicians and nonexamining physicians.  *Id.*, citing *Lester v. Chater*, 81 F.3d 821, 830

14    (9th Cir. 1995).  "'As a general rule, more weight should be given to the opinion of a treating source

15    than to the opinion of doctors who do not treat the claimant.'"  *Id.*  While the opinion of a treating

16    physician is entitled to greater weight than that of an examining physician, the opinion of an

17    examining physician is generally entitled to greater weight than that of a non-examining physician.

18    *Id.*, at 1012, citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  The weight

19    afforded to a non-examining physician's opinion depends on the degree to which she provides

20    supporting explanation for her opinions.  *Id.*

21        In explaining the reason for giving greater weight to the opinions of a treating physician, 20

22    C.F.R. § 404.1527(c)(2) states that a treating physician is likely to be "most able to provide a

23    detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique

24    perspective to the medical evidence that cannot be obtained from the objective medical findings

25    alone or from reports of individual examinations, such as consultive examinations or brief

26    hospitalizations."  If the treating physician's opinion on the nature and severity of the claimant's

27    impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques

28    and is not inconsistent with other substantial evidence in the case record, it will be given controlling

1   weight.  *Id.*  Even if the treating physician's opinion is not given controlling weight, the ALJ is

2   required to apply factors listed in the regulation in determining the weight to be given to his opinion.

3   20 C.F.R. § 404.1527(c)(2).  These factors include (i) the length of the treatment relationship and the

4   frequency of examination and (ii) the nature and extent of the treatment relationship.  In evaluating

5   the opinions of treating, examining and nonexamining physicians, the Commissioner should consider

6   the extent to which the opinion is supported by relevant evidence, particularly medical signs and

7   findings; the extent to which the opinion is consistent with the record as a whole; whether the

8   physician is a specialist opining within the area of his specialty; and other factors, including the

9   physician's familiarity with Social Security disability programs and their evidentiary requirements.

10  20 C.F.R. § 404.1527(c)(3)-(6).

11      If the opinion of a treating or examining doctor's opinion is contradicted by another doctor's

12  opinion, the ALJ may only reject it by providing specific and legitimate reasons supported by

13  substantial evidence.  *Garrison v. Colvin*, 759 F.3d at 1012.  "This is so because, even when

14  contradicted, a treating or examining physician's opinion is still owed deference and will often be

15  'entitled to the greatest weight . . .  even if it does not meet the test for controlling weight.'"  *Id.*,

16  quoting *Orne v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007).  To satisfy the substantial evidence

17  requirement, the ALJ should set forth a detailed and thorough summary of the facts and conflicting

18  clinical evidence, state his interpretations thereof, and make findings.  *Id.,* citing *Reddick v. Chater*,

19  157 F.3d 715, 725 (9th Cir. 1998).  "'The ALJ must do more than state conclusions.  He must set

20  forth his own interpretations and explain why they, rather than the doctors' are correct.'"  *Id.*

21      In rejecting Dr. Barone's opinion, the ALJ noted that he "is a family doctor and not an

22  orthopedic doctor, psychologist or psychiatrist."[2]  AR 30.  Plaintiff criticizes this statement by

23  asserting that Dr. Barone is a pain management specialist.[3]  *Plaintiff's Motion (#20), pg. 10.*  Dr.

24

25      [2]Elsewhere in his decision, the ALJ describes Dr. Barone as a "pain management doctor."  AR 29.

26
27  [3]According to the website of the American Society of Regional Anesthesia and Pain Medicine, "[a] pain
    management specialist is a physician with special training in evaluation, diagnosis and treatment of all different
    types of pain. . . .  An in-depth knowledge of the physiology of pain, the ability to evaluate patients with
28  complicated pain problems, understanding of specialized tests for diagnosing painful conditions, appropriate

1    Barone's letterhead indicates that he is an osteopathic physician.  AR 349.  There is nothing in the

2    record that describes Dr. Barone's training or experience in providing pain management treatment.  It

3    appears from the record, however, that Dr. Barone practiced "pain management" with respect to

4    Plaintiff over an extended time period.  He prescribed pain medications, including MS Contin,

5    Oxycodone, Gabapentin, Klonopin, and Fiorinol.  AR 349.  He administered trigger point injections

6    and he also referred Plaintiff for physical therapy treatment, although there are no physical therapy

7    treatment records in the administrative record.  Penn Medicine also gave Plaintiff a referral to Dr.

8    Barone for "pain management" in February 2010.  The ALJ's characterization of Dr. Barone as a

9    "family doctor" did not fairly consider his apparent area of specialization in pain management.  The

10    ALJ's statement that Dr. Barone's opinion "rests, at least in part, on areas outside his expertise" may

11    be correct with respect to his opinion that Plaintiff suffered from anxiety, depression and panic

12    disorders.  As a pain management physician, however, Dr. Barone may be well qualified to assess

13    whether a chronic pain patient suffers from anxiety or depression.  To the extent the ALJ rejected Dr.

14    Barone's opinions regarding the severity of Plaintiff's pain as outside his "area of expertise," his

15    criticism was clearly invalid.

16        The ALJ also asserted that Dr. Barone's report failed to reveal the type of significant clinical

17    and laboratory abnormalities one would expect if the claimant was disabled and that Dr. Barone did

18    not pursue a course of treatment that one would expect if the Plaintiff was disabled.  AR 30.  The

19    ALJ did not describe the specific clinical and laboratory abnormalities that he would have expected

20    to see.  Nor did he describe the course of treatment he would have expected to see.  As Plaintiff

21    asserts, Dr. Barone listed the following clinical findings in his September 15, 2012 questionnaire

22    responses as support for his diagnosis and assessment of Plaintiff's condition: antalgic gait,

23    hypertonic muscles, paraspinal decrease T-L ROM[4], multiple diffuse tenderpoints, [+] crepitus and

24    inflammation - synovitis [left] knee, [+] valgus deformity [left] knee."  Dr. Barone also referred to

25

26    prescribing of medications to varying pain problems, and skills to perform procedures (such as nerve blocks,
     spinal injections and other intervention techniques) are all part of what a pain management specialist uses to treat

27    pain."  See www.sdts.com/44/the-speciality-of-pain-management, accessed on April 28, 2016.

28        [4]This abbreviation may mean "thoracic to lumbar range of motion."

1  the MRIs of Plaintiff's lumbar spine and left knee which showed degenerative changes.  AR 412.

2  Dr. Barone's treatment notes did not contain detailed or specific descriptions of his clinical findings.

3  His treatment records, however, did make reference to multiple tender trigger points in the trapezius,

4  paraspinal and hip areas that presumably related to his diagnosis of fibromyalgia. AR 405.  Dr.

5  Barone's treatment records, letters and "Multiple Impairment Questionnaire" responses show that he

6  treated Plaintiff's chronic pain complaints with prescription pain medication, trigger point injections

7  and occasional physical therapy.  The ALJ failed to explain why this course of treatment was

8  contrary to what one would expect for the treatment of a patient allegedly suffering from disabling

9  chronic pain.

10      MRI studies revealed that Plaintiff had degenerative disc disease in the lumbar spine and

11  osteoarthritis and a lack of ligament support in the left knee.  There is no indication that the

12  deterioration or defects in Plaintiff's lumbar spine condition were severe enough to cause any

13  physician to recommend surgery or refer her for a surgical consultation.  Dr. Brislin did not believe

14  that further reconstruction of the knee would be beneficial.  He noted in 2009 and again in 2011 that

15  Plaintiff's knee pain seemed out of proportion to what was noted on the clinical examination and on

16  x-ray.  Dr. Brislin did not state, however, that he believed Plaintiff was feigning or exaggerating her

17  pain symptoms.

18      The ALJ did not dispute Dr. Barone's diagnosis of fibromyalgia and he listed it as a "severe

19  impairment" at step two of the sequential evaluation process.[5]  AR 24.  As stated in *Benecke v.*

20  *Barnhart*, 379 F.3d 587, 589-60 (9th Cir. 2004) "[c]ommon symptoms [of fibromyalgia] include

21  pain throughout the body, multiple trigger points, fatigue, stiffness and a pattern of sleep disturbance

22  that can exacerbate the cycle of pain and fatigue associated with this disease. (citations omitted).

23  Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the

24  medical community.  The disease is diagnosed entirely on the basis of patients' reports of pain and

25

26      [5]A finding that an impairment is "severe" at step two of the process does not mean that it is disabling.  As
27  stated in *Webb v. Barnhart*, 433 F.3d 683, 686-87 (9th Cir. 2005), "[a]n impairment or combination of
   impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than
28  a minimal effect on an individual's ability to work.'"

1   other symptoms." More recently in *Donovan v. Colvin*, 2016 WL 838026, *11-12 (D.Nev. January

2   21, 2016), the district court set out the criteria used to diagnose fibromyalgia, noting that SSR 12-12p

3   specifically addresses the evidence the Social Security Administration evaluates when a claimant

4   seeks disability benefits due to fibromyalgia. The ALJ did not question whether Dr. Barone had a

5   legitimate basis to diagnose fibromyalgia. Nor did the ALJ provide any explanation for rejecting

6   fibromyalgia as the cause of Plaintiff's chronic pain and fatigue.

7        The ALJ asserted that Dr. Barone's opinion "contrasts sharply with and is without support

8   from other evidence in the record, which renders it less persuasive." AR 30. Again, the ALJ did not

9   explain the basis for this assertion. The opinion of examining physician Dr. DeCarlo in January

10  2012 was consistent with Dr. Barone's opinion regarding Plaintiff's residual functional capacity.

11  The only apparent support for the ALJ's assertion are Dr. Brislin statements that Plaintiff's

12  complaints of left knee pain were out of proportion to his clinical findings and the x-ray of her knee.

13  As noted above, Dr. Brislin did not render any opinion that Plaintiff was feigning or exaggerating her

14  knee pain. Dr. Brislin saw the Plaintiff on approximately four occasions, twice in 2009 and twice

15  again in 2011. In contrast, Dr. Barone saw, examined and treated Plaintiff on a frequent basis from

16  December 2004 through August 2012. Thus, greater weight should be accorded to Dr. Barone's

17  findings on the basis of his frequent examinations and greater familiarity with Plaintiff's various

18  problems, symptoms and overall medical picture. In any event, the Court is not required to speculate

19  on what, if anything, the ALJ relied to support his assertion that Dr. Barone's opinion contrasted

20  sharply with other evidence in the record.

21       Finally, the ALJ raised the possibility that Dr. Barone's opinion was the result of  sympathy

22  or pressure from the patient to provide a report that supported her disability claim. The ALJ stated

23  that "[w]hile it is difficult to confirm the presence of such motives, they are more likely in situations

24  where the opinion in question departs substantially from the rest of the evidence of record, as is the

25  current case." AR 30. The ALJ, however, failed to establish the predicate for the assertion of a

26  suspect motive for Dr. Barone's opinion. The ALJ therefore failed to provide specific and legitimate

27  reasons supported by substantial evidence to reject the opinion of Dr. Barone regarding the

28  Plaintiff's residual functional capacity.

1   The ALJ also gave little weight to the consultive examination opinion of Dr. DeCarlo.  The

2   ALJ stated that Dr. DeCarlo's opinion that Plaintiff could only stand/walk and sit one hour in an

3   eight hour workday was inconsistent with his examination finding that Plaintiff's muscle strength in

4   the upper and lower extremities was 5/5.[6]  AR 29.  Because Dr. DeCarlo did not explain the basis

5   for his opinion, the ALJ provided a valid reason for giving it little weight. The ALJ could also

6   reasonably have given greater weight to the January 13, 2012 records review opinion of Dr. Smith

7   than to the opinion of Dr. DeCarlo.  Dr. Smith's report shows that she reviewed Plaintiff's medical

8   treatment records in arriving at her opinion.  The ALJ, however, failed to provide specific and

9   legitimate reasons for giving greater weight to Dr. Smith's opinion than to the opinion of Dr. Barone

10  as set forth in his September 15, 2012 responses to the "Multiple Impairment Questionnaire."

11      Plaintiff also attacks the validity of the ALJ's decision on the grounds that he did not provide

12  adequate reasons for rejecting the credibility of her statements and testimony regarding the severity

13  of her pain and other symptoms.  In the absence of affirmative evidence showing that a claimant is

14  malingering, the ALJ's  reasons for rejecting the credibility of the claimant's testimony regarding the

15  severity of her pain or other symptoms must be clear and convincing.  The ALJ must state the

16  reasons why the testimony is unpersuasive and specifically identify what testimony or evidence

17  undermines the claimant's complaints.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693

18  (2009); *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F. 3d 595, 599 (9th Cir. 1999).  If the claimant

19  produces objective medical evidence of an underlying impairment, the ALJ may not reject her

20  subjective complaints solely on a lack of medical evidence to fully corroborate the alleged severity of

21  her pain.  *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005), citing *Bunnell v. Sullivan,* 947 F.2d

22  341, 345 (9th Cir.1991).  Pain testimony may establish greater limitations than can medical evidence

23  alone.  *Id.*, citing SSR 96–7p (1996).  *See also Garrison v. Colvin*, 759 F.3d at 1014-15.  In

24

25      [6]SSR 96-9p states that "[j]obs are sedentary if walking and stand are required occasionally and other

26  sedentary criteria are met.  'Occasionally' means occurring from very little up to one-third of the time, and would
    generally total no more than about 2 hours of an 8-hour workday.  Sitting would generally total about 6 hours of

27  an 8-hour workday."  Thus, Dr. DeCarlo's opinion that Plaintiff was unable to stand/walk or sit for more that one
    hour in an eight hour workday placed her below the minimum functional capacity required to perform sedentary

28  work.

1   determining credibility, the ALJ may engage in ordinary techniques of credibility evaluation, such as

2   considering the claimant's reputation for truthfulness and inconsistencies in claimant's testimony.

3   *Burch*, 400 F.3d at 680, citing *Tonapetyan v. Halter,* 242 F.3d 1144, 1148 (9th Cir. 2001).  The ALJ

4   may also consider other factors such as (1) the nature, location, onset, duration, frequency, radiation,

5   and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity,

6   environmental conditions); (3) the type, dosage, effectiveness, and adverse side-effects of any pain

7   medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6)

8   the claimant's daily activities.  *Id.*, citing *Bunnell,* 947 F.2d at 346 (quoting SSR 88–13 (1988))

9   (superceded by SSR 95–5p (1995)).

10      The ALJ asserted that Plaintiff's statements concerning the intensity, persistence and limiting

11  effects of her symptoms were not credible because they were not supported by objective medical

12  signs and findings of the record as a whole.  The ALJ further stated that "[t]he consensus was that

13  the claimant's medications and overall treatment has controlled her symptoms, and her protestations

14  to the contrary, not objectively demonstrated, appear to be exaggerations."  AR 30.  The Court fails

15  to find the "consensus" referred to by the ALJ.  There is certainly nothing in Dr. Barone's records or

16  reports that indicates that Plaintiff's pain or other symptoms was sufficiently controlled by

17  medication and other treatment such that she was able to function in a working environment.  Dr.

18  DeCarlo's opinion, limited as it was, also does not support such a finding.  Dr. Brislin noted that

19  Plaintiff's left knee complaints appeared out of proportion to the examination findings.  While that

20  statement may cast some doubt on the credibility of Plaintiff's symptoms, it certainly does not

21  suggest that her pain was controlled by medication or other treatment.

22      Elsewhere in his decision, the ALJ noted that there was no evidence that Plaintiff ever

23  received the EMG testing that was repeatedly requested by Dr. Brislin.  The ALJ stated that "[t]his

24  would suggest the claimant did not find her symptoms bothersome enough to warrant medical

25  compliance with Dr. Brislin's recommended EMG testing."  AR 28.  The ALJ also stated that

26  Plaintiff "did not undergo surgery or physical therapy sessions which doctors usually prescribe when

27  conservative treatment fails.  A reasonable inference therefore is that her symptoms were not as

28  severe as alleged, which detracts from her general credibility."  AR 28.

In assessing a claimant's credibility, the ALJ may consider an "'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007). Here, Plaintiff's apparent failure to obtain the EMG test that Dr. Brislin requested can be legitimately considered in assessing her credibility. Dr. Brislin stated, however, that he did not consider Plaintiff a candidate for further reconstructive surgery of the knee and Plaintiff testified that she understood that Dr. Brislin would not perform knee replacement surgery due to her age. Likewise, there is no evidence that Plaintiff's lumbar spine defects were of such severity, or a cause of significant low back pain or radiating symptoms as to justify surgery. Plaintiff, however, was diagnosed with fibromyalgia related pain which does not lend itself to surgical treatment. The absence of significant physical therapy records may also cast some doubt on the severity of Plaintiff's symptoms. Dr. Barone indicated, however, that Plaintiff did receive physical therapy during the course of his care of her. On balance, the Court finds that while these facts cast some doubt on the credibility of Plaintiff's complaints of severe pain, they do not, standing alone, provide clear and convincing reasons to reject the credibility of her statements and testimony.

The ALJ noted that Plaintiff's statements described daily activities that were "fairly limited." He stated that two factors weighed against considering these statements to be strong evidence in favor of finding her disabled. First, the ALJ stated that allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Second, he stated that it was difficult to attribute that degree of limitation to Plaintiff's medical condition as opposed to other reasons–again referencing his belief that Plaintiff's complaints of severe pain were inconsistent with the objective medical evidence. The ALJ also cited the fact that Plaintiff had a very limited earnings history which showed that she never worked at substantial gainful levels. AR 31.

It is noteworthy that the ALJ did not find evidence that Plaintiff was able to engage in activities of daily living that were inconsistent with her allegations of severe pain and functional limitations. Plaintiff's testimony was supported by the function report of her fiancé. The Court accepts that a claimant's testimony regarding her inability to perform activities of daily living may be difficult to verify and that the testimony of the claimant, family members, relatives and friends may be self-serving. The Social Security Act, however, requires the ALJ to consider and weigh the

1  testimony of the claimant and others laypersons regarding limitations on the claimant's ability to

2  engage in activities of daily living.  *See Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1053

3  (9th Cir.2006) and *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993) ("friends and family

4  members in a position to observe a claimant's symptoms and daily activities are competent to testify

5  as to [a claimant's] condition.").  In rejecting such testimony and statements, the ALJ must be able to

6  point to factors which reasonably call into question the claimant's or witness's credibility.  The

7  medical records established that Plaintiff had a long history of back, knee and leg pain, as well as

8  weakness and fatigue which Dr. Barone opined substantially limited her ability to lift and carry

9  weight in excess of ten pounds and which substantially limited her ability to stand, walk and sit.

10  Plaintiff's testimony and the statement of her fiancé regarding her limited activities of daily living

11  was consistent with that medical history.  Although the Plaintiff did not have a substantial history of

12  gainful employment, her long period of unemployment reasonably appears attributable to her

13  medical condition.  The ALJ therefore failed to provide clear and convincing reasons to reject the

14  credibility of Plaintiff's testimony regarding the severity of her symptoms.

15      If the court determines that the ALJ's denial of benefits results from an improper rejection of

16  Plaintiff's testimony regarding the severity of her symptoms, or a rejection of the opinion of the

17  Plaintiff's treating physician(s), then the court must apply a three-part test to determine if the matter

18  should be remanded for an award of benefits or for further proceedings.  The court must decide

19  whether (1) the record has been fully developed and further administrative proceedings would serve

20  no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence,

21  whether it is claimant testimony or medical opinion; and (3) if improperly discredited evidence were

22  credited as true, the ALJ would be required to find the claimant disabled on remand.  *Garrison v.*

23  *Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014); *See also Varney v. Sec'y of Health and Human Servs.*,

24  859 F.2d 1396, 1401 (9th Cir. 1988).  Generally, when all of these conditions are met, the court must

25  remand for an award of benefits.  *Garrison*, 759 F.3d 1020–21.  However, if an evaluation of the

26  record as a whole  "creates serious doubt as to whether the claimant is, in fact, disabled within the

27  meaning of the Social Security Act," then remand for further proceedings is proper.  *Id.*

28  . . .

The Court finds that all three elements of the test are satisfied. The record appears to be fully developed such that remand for further administrative proceedings would serve no useful purpose. Second, the ALJ failed to provide legally sufficient reasons to reject the opinion of Plaintiff's treating physician, Dr. Barone, and also failed to provide sufficient reasons to reject the credibility of Plaintiff's testimony and statements regarding the severity of her symptoms. Third, if Dr. Barone's opinion and Plaintiff's testimony was credited as true, the ALJ would be required to find that Plaintiff was disabled. Finally, the record as a whole does not cast serious doubt as to whether Plaintiff is disabled.

## CONCLUSION

The Court concludes that the ALJ erred in rejecting the opinion of Plaintiff's treating physician that she does not have the residual functional capacity to perform work at the sedentary level and is therefore disabled. The ALJ also erred in rejecting the credibility of Plaintiff's statements and testimony regarding the severity of her symptoms. Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Judgment on the Pleadings (#20) be **granted**, that the Acting Commissioner's Cross-Motion to Affirm (#21) be **denied**, and that this matter be remanded to the Social Security Administration with instructions to pay benefits in accordance with this recommendation.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal

. . .

. . .

. . .

29

factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 4th day of May, 2016.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge